IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ZSOLT LAGLER,

    Plaintiff,

vs.                                      CASE NO.: 6:03-cv-789-Orl-18KRS

HEALTH FIRST, INC., and HOLMES
REGIONAL MEDICAL CENTER, INC.,

    Defendants.
_____/

## ORDER

THIS CAUSE comes before the Court upon Defendants' motion for summary judgment (Doc. 48, filed January 31, 2005), to which Plaintiff responded in opposition (Doc. 74, filed February 21, 2005). Plaintiff Zsolt Lagler ("Plaintiff" or "Lagler") brings this case against his former employers, Defendants Health First, Inc. and Holmes Regional Medical Center, Inc. ("Defendants") under Title VII and the Florida Civil Rights Act ("FCRA") for alleged retaliation. The Court grants Defendants' motion for summary judgment.

### I. BACKGROUND

Lagler, a male nurse, began working for Holmes Regional Medical Center, Inc. ("HRMC") as a per-diem nurse in the post-anesthesia care unit ("PACU") in January, 2000. As a per-diem nurse, Lagler filled shifts on an as-needed basis and HRMC did not guarantee him a pre-determined number of hours. Lagler was the only male nurse in the PACU. (Compl. at ¶ 11; Answer at ¶ 11.)

In February of 2001, Lagler's initial PACU manager, Donna Miller-Rushing, spoke with Lagler on separate occasions about two complaints she had received. The first complaint, dated February 7, 2001, involved a patient who had received "cold and uncaring" treatment from an

unidentified "male nurse." The second complaint, dated February 22, 2001, involved a man who complained that Lagler had prevented him from seeing his daughter. After speaking with Lagler about the incidents, Miller-Rushing asked Dennis Vouglas, Director of Employee Relations, to meet with her and Lagler.

In September, 2001, Carol Freeman became Lagler's PACU Manager shortly before Lagler transferred, on September 19, to the Open Heart Unit ("OHU"). On January 15, 2002, Lagler contacted Freeman to request a transfer back to PACU. Lagler informed Freeman that he felt discriminated against on account of his gender because he did not have a fixed shift as all the female nurses did. Freeman granted Lagler's request and allowed him to return to PACU.

On January 16, 2002, Lagler covered an evening shift at the request of his immediate supervisor, Helen Bottorf. The next morning, Freeman contacted Lagler about the expenses associated with the open slot being covered by a per-diem nurse and told Lagler he could not have "carte blanche" on the schedule. (Freeman Dep. at 92-94; Lagler Dep. at 63.) Later that day, Lagler initiated a meeting with Freeman and requested a witness to be present. Freeman prepared an anecdotal note in which she described the meeting in the following way[1]:

> Z initiated the conversation stating he felt that he was being harassed and went on to list his qualities as a per diem employee working days, shifts and caring for patients that other employees didn't want. Z is a hard worker and is very flexible and I never disputed this aspect of his clinical performance. Z's attitude and confrontational tone during this meeting were inappropriate and needs to be documented and addressed. Z needs to understand that fair and equitable utilization of per diem staff is not personal harassment. He needs to realize that there are appropriate channels for addressing his grievances and he needs to follow the chain of command. As a per diem employee, his ability to "work" with the management of this department will enhance the options of scheduling him in the department. (Defs.' Ex. 3.)

---

[1] In the record, HRMC staff members refer to Lagler as "Z," "Zolt," and "Zsolt."

2

On February 17, 2002, Lagler and Jean Jardine, a PACU nurse, engaged in a verbal confrontation at a patient's bedside. Both individuals received counseling memos following the incident. Freeman's memo stated the following:

> On 2/17/2002 Zolt was on call in PACU and could not be reached by phone. When Zolt arrived in PACU approxi. 10 minutes after the OR case came out, he engaged in a verbal confrontation with Jean Jardine RN. This interaction escalated to a loud verbal argument in the presence of 2 pre-op patients, 2 PACU patients and the nursing supervisor, Leslie Hoskovic. The supervisor interceded and directed both individuals to lower their voices. She took Zolt aside and indicated that his behavior was inappropriate. The supervisor informed both staff members not to discuss the issue further. (Defs.' Ex. 4.)

On February 28, 2002, Freeman completed Lagler's annual Performance Review, which praised Lagler's flexibility, clinical skills, and patient care but stated that Lagler "has exhibited a temper at times when dealing with peers when he's frustrated." (Defs.' Ex. 6 at 2.)

In April, 2002, Lagler received a part-time (as opposed to per-diem) flexible position.

On June 12, 2002, Lagler confided, "in strict confidence," to Ally Mott, a clinical charge nurse, that he had problems with hyper-activity. (Lagler Aff. at ¶¶ 18-19.)

On June 13, 2002, Lagler received counseling memos from Bottorf and Freeman regarding Lagler's playing with a football, remote control car, and water pistol in the presence of patients and staff. (Pl.'s Ex. 33; 34.) The memo stated in part:

> In spite of addressing this on numerous occassions [sic] Zsolt has demonstrated non professional [sic] behaviour in the department, in the presence of patients and peers. After three separate incidents of bringing toys into the department and receiving verbal warning with each occurrance [sic] the behaviour did cease. Zsolt has acknowledged difficulty in managing his behaviour to Ally Mott, clinical charge. (Pl.'s Ex. 33.)

On June 19, 2002, Lagler filed a charge of discrimination with the Florida Commission on Human Relations and the U.S. Equal Employment Opportunity Commission ("EEOC"), claiming to be the victim of disparate treatment and a hostile work environment on the basis of

3

sex.

On June 26, 2002, Lagler spoke to Bill Matthews, the EEOC representative who Lagler had filed his charge with, and learned that the Defendants' would be receiving the EEOC charge that day.

On June 27, 2002, Lagler was involved in an incident with Dr. Greene, a cardio-pulmonary surgeon, which was the event that Defendants allege precipitated Lagler's termination. That day, Lagler had the responsibility of implementing Dr. Greene's order to take an x-ray and call Dr. Greene when the x-ray arrived at the patient's bedside. The developed x-ray became lost. Lagler states that Dr. Abad and Dr. Schrader, both anesthesia doctors, checked the patient and informed Lagler that the patient could leave the PACU. (Lagler Aff. at ¶¶ 143-44.) Lagler also states that Bottorf, Lagler's charge nurse, directed Lagler to discharge the patient out of the PACU in order to free up bed space and another nurse. (Lagler Aff. at ¶ 144.) Lagler moved the patient out of the PACU.

Dr. Greene called Lagler and asked where the x-ray was and why the patient had been moved out of the PACU. (Lagler Dep. at 130-33.) Lagler states that Dr. Greene was screaming and yelling at him during the conversation. (Defs.' Ex. 2 at 16.) After the phone call, Dr. Greene requested Damon Green, Health First's former Director of Risk Management, to investigate the matter. (Green Dep. at 26.) Green then called Lagler to get information. Lagler told Green that he would not explain the situation on the phone because he preferred to talk to Green in person with a witness present. (Lagler Dep. at 150.) Lagler referred Green to Bottorf and gave the phone to her. (Lagler Dep. at 151.) Later that evening, Green spoke with Kent Brown, the Chief Operating Officer, and described Lagler as having "a horrible attitude." (Green Dep. at 60.) At deposition, Green described Lagler with respect to the call as "a

disengaged associate. He was not recoverable. [and] he was never going to become engaged. . . . He had an axe to grind, whatever it was." (Green Dep. at 61.)

Freeman wrote a counseling memo, dated June 28, 2002, about the incident, which stated:

> Zsolt did not complete a physician order for a patient under his care in the PACU and as a result of not following thru the patient's care was compromised. Customer service for both the patient and the physician suffered as the x-ray was repeated several hours later after the patient transferred to the floor. Zsolt needs to review the patient's chart for post-op orders in PACU and follow through with orders. (Pl.'s Ex. 42.)[2]

On June 28, 2002, Dr. Greene called Freeman about the incident. Freeman testified that Dr. Greene "was upset, that he felt an order had been missed, that he had requested an x-ray be done and that he be contacted when the film was available at the bedside." (Freeman Dep. at 144.) Freeman informed Dr. Greene that she would investigate the matter. (Id.) That same day, Freeman met with Lagler to discuss the incident. Freeman wrote a counseling memo concerning the meeting, dated July 1, 2002, in which she stated the following:

> On 6/28/2002, I spoke with Zsolt in my office in the presence of Helen Bottorf and Ally Mott, clinical charge nurses. I indicated that I was seeking information regarding the patient care issue the evening before involving Dr. Green's [sic] patient. When I verbalized the information received from other associates involved in the incident, Zsolt became angry and agitated stating "I know where this conversation is going." "I'm going to terminate this right now." "I want to leave now." His body language and tone of voice were hostile. He verbalized that "he wasn't going to take it" and "I know what you are doing" in spite of my attempt to explain that I was only seeking information from his perspective concerning the incident. He then left the office and the department. The defensive attitude exhibited by Zsolt when asked about this incident was unwarranted. Zsolt's refusal to discuss the situation and attitude exhibited during this conversation demonstrates insubordination. Zsolt has demonstrated this attitude and behavior during previous conversations with the

---

[2] Lagler disputes that he did not complete the physician order. (Doc. 74 at 18.)

management staff regarding counseling sessions. (Pl.'s Ex. 43.)[3]

Lagler prepared an entry in his personal notes about the meeting that described Freeman as taking an aggressive tone, making accusatory remarks, and telling Lagler that he showed poor clinical judgement. (Defs.' Ex. 2 at 17.) Lagler also recorded his approach towards Freeman, in the following way:

> At this time, I did remind Ms. Freeman she has never taken a patient in our PACU, and she has never given PACU care in our unit. I also reminded her that she spends most of her time in her office, and she is not aware of what we do to move patients out, i.e. what is commonly done and what is not commonly done. I also reminded her she was not at the bedside making the call with limited space and staff in the PACU. Furthermore, I told her in my ten years of nursing never had my clinical judgment been questioned, nor have I ever lost a patient in the PACU. I asked her has she ever experienced Dr. Greene verbally abusing her on the phone, and I asked her what she was going to do about him being verbally abusive to me. I reminded her that he has a reputaton of being verbally abusive and making it hard to work with/for him. I asked her if she was going to reprimand him? She did not respond. At this time I told her she had made me upset by making accusations against me. I told her that she is being retaliatory for me contacting the government, and she was taking what was commonly done practice and writing it up against me. I told her to step out into the department and ask everyone if they had not done this before. She did not. At that time it was roughly 1600. I told them it would not be safe for me to continue to work due to my being upset. I asked them to be dismissed for the day. It was granted. (Defs.' Ex. 2 at 17.)

Freeman spoke to Jennifer McCarthy, Human Resources Administrator, about her meeting with Lagler and they arranged to meet with Lagler together. On July 2, 2002, Freeman and McCarthy met with Lagler and his witness, Larry Hustoles, a CCU staff nurse. At deposition, McCarthy testified that when she began to ask Lagler about the facts of the incident, Lagler responded in the following way:

---

[3] Lagler disputes that he became angry, defensive, raised his voice, or refused to discuss the x-ray incident. (Doc. 74 at 16.)

> [Lagler] became very accusatory, wouldn't address [Freeman], wouldn't look at her, wouldn't speak to her, referred to her as "her," became very hostile with me, at one point standing up, kind of pointing and shaking his finger at me, said I didn't know what was going on. I sat here in an office. I don't work in the PACU." (McCarthy Dep. at 90.)[4]

McCarthy also testified that she stated the following to Lagler: "I never in my professional career have been spoken to this way by anyone, whether it be an associate, a peer, somebody I reported to." (Id.) At that point McCarthy stated that she closed the meeting because the meeting was "not getting anywhere." (Id.)

Freeman prepared a counseling memo concerning the meeting, dated July 3, 2002, which stated in part:

> Zsolt refused to accept or understand any responsibility for clinical error. He would not answer specific questions regarding the error. Zsolt's behavior was hostile and intimidating. Jennifer attempted to discuss Zsolt's perceptions and feelings, but he would not engage in a discussion. (Pl.'s Ex. 44.)

Lagler prepared an entry in his personal notes about the meeting, which stated in part:

> [McCarthy] told me that it was in poor judgement for me to send the patient to PCU. I asked [McCarthy] when was the last time she was at the bedside taking care of a patient. And I also asked [Freeman] when was the last time she took care of an ICU or any patient and had to make a nursing decision. She replied, "I resent that." . . . . They said they wanted to discuss the issue of the X-Ray further. I pointed out to them that a disciplinary slip already filled out was on the desk, and that what I had to say really didn't matter; a judgement was already made . . . In this meeting I never lost my temper and never raised my voice. I was very direct and to the point. It should be noted that the person for HR stated that she had never met me before, but she perceived me as being hostile and threatening. (Defs.' Ex. 2 at 18-19.)

On July 3, 2002, McCarthy, Freeman, Green, Vouglas, and Brown met to discuss the appropriate discipline for Lagler. Due to the EEOC charge, the managers were aware that a termination, at that time, could be perceived as retaliation. (Vouglas Dep. at 197; Brown Dep.

---

[4] Lagler disputes that he ever shook a finger or became hostile or threatening during the meeting.

7

at 198-99.) The managers collectively concluded that termination was appropriate. (Freeman Dep. at 239.) McCarthy testified that because of Lagler's "aggressive behavior" and "hostility," she requested that Vouglas join her and Freeman at Lagler's termination meeting. (McCarthy Dep. at 219.) Vouglas agreed to join them. (Vouglas Dep. at 59-60.) On the same day, Vouglas, McCarthy, and Freeman terminated Lagler. The "Managers Appraisal of Exiting Associate," written by Freeman six days after Lagler's termination, stated: "Zsolt was terminated after receiving counseling for multiple episodes of unprofessional behavior and attitude and a clinical error." (Pl.'s Ex. 45.)

On the next line, Freeman explained why she would not recommend the associate for rehire: "Zsolt has not accepted ownership or responsibility for his behavior and actions identified in counseling memos." (Pl.'s Ex. 45.) Additionally, the appraisal provided a chart that allowed Freeman to rank Lagler's performance. Lagler received a "poor" performance in the category of "attitude toward supervision." (Pl.'s Ex. 45.)

Based on his termination, Lagler brings this case alleging retaliation for his complaints of gender discrimination.

## II. DISCUSSION

### A. Summary Judgment Standard

A court will grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see e.g., Stachel v. City of Cape Canaveral, 51 F. Supp. 2d 1326, 1329 (M.D. Fla. 1999). Material facts are those that may affect the outcome of the case

8

under the applicable substantive law. Disputed issues of material fact preclude the entry of summary judgment, but factual disputes that are irrelevant or unnecessary do not. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of proving that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 324-25 (1986). In determining whether the moving party has satisfied its burden, the Court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. Matsushita Elec. Ind. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). The moving party may rely solely on his pleadings to satisfy its burden. Celotex, 477 U.S. at 323-24. A non-moving party bearing the burden of proof, however, must go beyond the pleadings and submit affidavits, depositions, answers to interrogatories, or admissions that designate specific facts indicating there is a genuine issue for trial. Id. at 324. If the evidence offered by the non-moving party is merely colorable, or is not significantly probative, the Court may grant summary judgment. Anderson, 477 U.S. at 249-50. Similarly, summary judgment is mandated against a party who fails to prove an essential element of its case. Celotex, 477 U.S. at 322.

*B. Retaliation Under Title VII*

Lagler brings this case solely on the basis of retaliation. Retaliation is a separate offense under Title VII; an employee need not prove discrimination for the retaliation claim to succeed. See Sullivan v. Nat'l R.R. Passenger Corp., 170 F.3d 1056, 1059 (11th Cir. 1999). Title VII and the FCRA contain anti-retaliation provisions that make it unlawful for an employer to retaliate against any individual because he "has opposed any practice made an unlawful employment

9

practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).[5][6] Here, where plaintiff relies on circumstantial evidence of retaliatory intent, the claim is analyzed under the familiar three-part, burden-shifting analysis promulgated by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) and <u>Tex. Dept. of Comm. Affairs v. Burdine</u>, 450 U.S. 248 (1981). See <u>Rojas v. Florida</u>, 285 F.3d 1339, 1342 (11th Cir. 2002). Under this framework, the plaintiff has the initial burden of establishing a prima facie case by a preponderance of the evidence. <u>Burdine</u>, 450 U.S. at 252-53. If the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason for the employee's rejection." <u>Id.</u> at 253 (internal quotation and citation omitted). If the defendant offers a legitimate, nondiscriminatory reason, the plaintiff can avoid summary judgment only by producing "sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1037 (11th Cir. 2000) (citing <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1543 (11th Cir. 1997) (requiring a plaintiff to rebut "all of the defendant's proffered nondiscriminatory reasons for its actions" to avoid

---

[5] Section 760.10(7) of the FCRA mirrors Title VII. The statute states that it is unlawful for the employer "to discriminate against any person because that person has opposed any practice which is an unlawful employment practice under this section, or because that person has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this section." <u>Fla. Stat.</u> ch. 760.10(7)(2003).

[6] The analysis for Lagler's FCRA claim of retaliation is the same for the Title VII analysis. "Florida courts have held that decisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act, because the Florida act was patterned after Title VII." <u>Harper v. Blockbuster Entm't Corp.</u>, 139 F.3d 1385, 1387, 1389-90 (11th Cir. 1998); <u>see also</u> <u>Florida State Univ. v. Sondel</u>, 685 So.2d 923 (Fla. 1st DCA 1996).

10

judgment as a matter of law)).

### 1. Lagler Establishes a Prima Facie Case

To establish a prima facie retaliation claim under Title VII, a "plaintiff must show (1) that she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) that there is some causal relation between the two events." Cooper v. S. Co., 390 F.3d 695, 740 (11th Cir. 2004) (internal quotation and citation omitted).[7]

Only the third factor, the existence of a causal relation between the protected activity and the termination, is disputed by the parties. To satisfy the causal link requirement, the plaintiff need only demonstrate "that the protected activity and the adverse action were not *wholly unrelated.*" Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999) (internal quotation and citation omitted). Lagler contends that the temporal proximity between his charge of gender discrimination and ultimate termination establishes a causal relation. On June 26, 2002, Lagler learned that Defendants received a copy of Lagler's EEOC Charge of gender discrimination. On June 27, the incident occurred regarding Lagler's decision to discharge a patient from the PACU. This incident and Lagler's alleged actions of insubordination were the reasons provided for Lagler's termination, which occurred on July 3, 2002. In the memorandum

---

[7] In his response, Lagler contends that the Complaint identifies Defendants' "disciplinary actions" in addition to the termination as constituting adverse employment actions. (Doc. 74 at 18.) The Complaint, however, only identifies the termination as constituting an adverse action. (See Complaint at ¶¶ 38, 45-46.) What Lagler means by "disciplinary actions" remains unclear. In the Complaint's chronology of facts, Lagler makes mention of Freeman's anecdotal note and counseling memos. To prove an adverse employment action the employee must show "a *serious and material* change in the terms, conditions, and privileges of employment. . . . as viewed by a reasonable person in the circumstances." Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir. 2001). The anecdotal note and counseling memos fail to constitute adverse employment actions.

of undisputed facts. Defendants concede that the decision-makers were aware of Lagler's charge of discrimination before concluding to terminate him. (Doc. 52 at ¶ 53.) The Eleventh Circuit has held that "a plaintiff satisfies [the causal relation] element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action." Farley, 197 F.3d at 1337. Lagler, therefore, has successfully made a prima facie case of retaliation.

### 2. Defendants Offer a Non-Discriminatory Reason

The burden now shifts to Defendants to show a legitimate, nondiscriminatory reason for Lagler's termination. The Eleventh Circuit has explained that "'the defendant's burden of rebuttal is exceedingly light . . . . At this stage of the inquiry, the defendant need not persuade the court that its proffered reasons are legitimate; the defendant's burden is merely one of production, not proof.'" Cooper, 390 F.3d at 725 (alterations in original) (quoting Perryman v. Johnson Prods. Co., 698 F.2d 1138, 1142 (11th Cir. 1983)). The defendant's explanation of its legitimate reason, however, "must be clear and reasonably specific so that the plaintiff be afforded a full and fair opportunity to demonstrate pretext." Chapman, 229 F.3d at 1012, 1034 (internal quotations and citation omitted).

Defendants assert that Lagler was fired as a result of his insubordination toward managerial employees. (Doc. 48 at 8.)[8] Defendants have offered more than enough evidence to establish insubordination as a legitimate non-discriminatory reason. First, before Lagler made any complaint of gender discrimination known to his employers, Miller-Rushing (Lagler's immediate supervisor) and Dennis Vouglas (Director of Employee Relations) confronted Lagler

---

[8] The American Heritage Dictionary, 681 (1976) defines insubordinate as "not submissive to authority."

12

about two complaints that had been received by the department. Vouglas testified that Lagler exhibited poor behavior during the meeting:

> Zsolt became very upset with what was being alleged about his patient care and took great objection [and] he felt personally affronted and was extremely unwilling to accept any of this feedback about any of these allegations. He refused, basically, to take any responsibility, even for the possibility that somebody may have been perceiving his patient care in a manner that was less than satisfactory in their view. In the course of the conversation, I talked to Zsolt and tried to help him understand that these were, in fact, perceptions and that if, in fact, the patients felt this way about the care that they are receiving, it was feedback that needed at least to be processed. It was not questioning, calling into question his professional capabilities or his integrity or anything of the sort. It was simply trying to communicate that there were feelings that some patients had about the way they thought they were being treated. And Zsolt became again, as I say, very distressed, agitated, unwilling, basically, to hear any of that feedback and just did not want to accept any responsibility that he may have had some—played some part in these perceptions being created. (Vouglas Dep. at 166-67.)

Second, between the time of Lagler's return to the PACU and Lagler's termination, Defendants offer evidence of Lagler's poor behavior. The following list paraphrases the more complete chronology laid out in Part I, *supra*:

(1) Freeman's January 17, 2002 anecdotal note regarding Lagler's inappropriate attitude.

(2) Freeman's February 17, 2002 counseling memo involving Lagler's altercation with Jean Jardine in the presence of patients.

(3) Freeman's February 28, 2002 Performance Review, stating that Lagler "exhibited a temper at times when dealing with peers when he's frustrated." (Defs.' Ex. 6 at 2.)

(4) Freeman and Bottorf's counseling memos regarding unprofessional incidents of playing with toys in the presence of staff and patients.

(5) Damon Green's telephone conversation with Lagler, which caused Green to describe Lagler as having "a horrible attitude" on the same day. (Green Dep. at 60-61.)

13

(6) Freeman's counseling memo concerning the June 28, 2002 meeting, in which Freeman described Lagler's behavior as angry, hostile, defensive, and insubordinate. (Pl.'s Ex. 43.)[9]

(7) McCarthy's account of the July 2, 2002 meeting, in which she testified that Lagler acted hostile and accusatory during the meeting.

(8) Freeman's counseling memo concerning the July 2, 2002 meeting, in which she described Lagler as hostile and intimidating, and recorded that Lagler would not accept responsibility or answer specific questions regarding the clinical error.[10]

In light of the aforementioned evidence, Defendants have provided a clear and reasonably specific factual basis for their reason to terminate Lagler on grounds of insubordination.

### 3. Lagler Fails to Show Pretext

Having found a legitimate, non-discriminatory reason for termination, the Court turns to whether Lagler established that Defendants' proffered reason is pretextual. A plaintiff may prove pretext directly or indirectly. <u>Mayfield v. Patterson Pump Co.</u>, 101 F.3d 1371, 1376 (11th Cir. 1996). Pretext is proven directly "by persuading the court that a discriminatory reason more likely motivated the employer." <u>Id.</u> Pretext is proven indirectly "by showing that the employer's proffered explanation is unworthy of credence." <u>Id.</u> "Conclusory allegations of

---

[9] Lagler's personal notes support the confrontational tone of June 28th meeting. Lagler records that he stated to Freeman that she: had never taken a patient in PACU, had never given PACU care in the unit, spent most of her time in the office, was not aware of what the nurses do to move patients out, was not at the bedside making the call that day, was the first person to question his clinical judgment, had made him upset by making accusations, was being retaliatory for his contacting the government, and should reprimand Dr. Greene. (Defs.' Ex. 2, at 18.)

[10] Again, Lagler's personal notes support the confrontational tone of the July 2nd meeting. Lagler records that he recounts asking McCarthy when the last time she had been at a bedside taking care of a patient or had to make a nursing decision. Lagler also recounts that Freeman stated that she resented the comment.

discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions." Id. (internal quotation and citations omitted).

As an initial matter, it is clearly evident that Lagler fails to establish pretext directly; that is, Lagler's evidence is insufficient to show that a retaliatory reason "more likely motivated the employer." Mayfield, 101 F.3d at 1371. The evidence of Lagler's poor behavior in his interactions with various HRMC employees represents a well supported pattern while the evidence of retaliation relies on comparably weak, circumstantial evidence. The question, then, is whether Lagler's circumstantial evidence "demonstrate[s] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Cooper, 390 F.3d at 725 (citation and internal quotation omitted). The Court answers this question in the negative.

Lagler attempts to establish pretext in four ways. First, Lagler contends that he was never insubordinate and disputes certain characterizations in Defendants' memorandum of law. (Doc. 74 at 8-16.) The Court is aware of the facts that Lagler disputes.[11] There is, however, more than enough undisputed evidence to support Defendants' proffered reason. For example, Lagler does not dispute: (1) the recorded managerial perceptions of unprofessionalism and poor

---

[11] Lagler, relying on his own testimony, asserts that he did not: 1) refuse to speak to Dr. Greene during their phone conversations; 2) refuse to discuss the x-ray incident with Dr. Greene or Mr. Green; 3) tell McCarthy or Freeman that they "did not know what they were doing or what was going on in the PACU"; and 4) terminate the June 28 and July 2 meetings. Lagler also disputes the allegation "that he refused to accept responsibility for his actions" because, Lagler states, he never did a wrong that would have required him to take responsibility. (Doc. 74 at 14-15.) Finally, Lagler disputes any characterization of insubordination or disrespect on his part towards others. (Doc. 74 at 9; 15-16.)

15

behavior from at least four different managers in counseling memos and depositions; (2) the issuance of counseling memos regarding his altercations with fellow staff members, playing with toys in front of patients, and his June 27 decision to discharge the patient; or (3) the contents of his own personal notes concerning the June 28 and July 2 meetings where he recounts confronting Freeman and McCarthy on their clinical experience. The Court finds that Lagler's dispute of various facts does nothing to rebut head-on the heart of Defendants' evidence. See Chapman, 229 F.3d at 1030 ("Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.").

Second, Lagler takes issue with Defendants' memorandum of law, which states that "whether Plaintiff actually made a clinical mistake is immaterial; Plaintiff was not fired for making a mistake; he was terminated because of his insubordinate behavior." (Doc. 48 at 8.) Lagler contends that Defendants' reasons for termination, as shown in exhibits and depositions, explicitly assert that Lagler was fired for his clinical error. Because Defendants argue that the clinical error was immaterial, Lagler insists that Defendants are involved in an inconsistency that establishes pretext.

To the extent there is an inconsistency, it lacks significance. It is true that Freeman's exiting appraisal, cited by Lagler, includes the clinical error as part of the reason for termination. It is clear, however, that the bulk of Freeman's comments were aimed at Lagler's alleged behavior problems. Freeman explicitly stated that Lagler: (1) received counseling for multiple episodes of unprofessional behavior and attitude, and (2) did not accept responsibility for his behavior and actions. Defendants' characterization may be an oversimplification, but it does not

reveal an inconsistency that casts the proffered reason of insubordination in a dishonest light.

Third, Lagler asserts that Freeman treated him differently than other employees.

Lagler submits the following evidence:

(1) Sue Stehman's deposition testimony where she recalls two complaints of discrimination: one involving race and pregnancy discrimination and the other involving nationality discrimination. (Stehman Dep. at 48-49.) Stehman testified that the individual complaining of nationality discrimination continues to be employed by Health First while the individual complaining of race and pregnancy discrimination was terminated. (Stehman Dep. at 48, 50.)[12] Stehman explained that the later individual was given disciplinary action in which she was asked to take a day off with pay and return with an action plan to improve her attitude and behavior or bring a letter of resignation; because she did neither, she was terminated. (Stehman Dep. at 49-50.)

(2) a letter written by Jean Jardine to Freeman, which stated in part: "[I]t appears your goal is to staff the PACU with nurses who can be easily intimidated (and kept "in line") and rid the unit of assertive critical care nurses, who typically "speak out" on issues such as patient care standards." (Pl.'s Ex. 54 at 4.)

(3) an affidavit from Beth Standing, a PACU nurse, which stated in part:
> I was well-aware of the toys and water incidents that took place in the PACU and found them to be trivial. I believe that these incidents were something that management would focus on if they were "after you." There were little groups of "witch hunters" among the staff in the PACU who did not like employees to complain about anything or raise a concern about anything. At some point in time, they definitely focused their attentions on Mr. Lagler. (Standing Aff. at ¶ 7.)

(4) an affidavit from Lori Roskowiak, a PACU nurse, which stated in part:
> I was, however, present on occasions when Zee was disciplined in 2002, and I believe he was singled out by management. In fact, sometimes when I would arrive in the PACU, the other nurses would tell me that Zee had been disciplined and they would tell be [sic] about other staff members who had done the same thing and were not disciplined. It was common knowledge in 2002, that Zee was treated differently than the rest of us. By mid-2002, it was obvious that Carol Freeman did not care for Zee. I could tell this from her body language and her tone of voice. I am not saying the Zee was the only person in the PACU that Carol did not care for, but she definitely singled him out for discipline. She did not assess a situation before reacting. I believe that Carol Freeman was determined to fire Zee before she left her employment with Holmes. (Roskowiak Aff. at ¶¶ 6-7.)

---

[12]Lagler claims that both employees were terminated (Doc. 74 at ¶ 52) but Stehman's testimony clearly states that one of the employees continues to work as a materials management assistant for Health First.

17

The evidence fails to contradict or cast the Defendants' proffered reason in a dubious light. The fact that a complainant of race and pregnancy discrimination received termination for not following the disciplinary action procedure, does very little, if nothing at all, to further Lagler's cause. Jardine, Standing, and Roskowiak, each complain about managerial behavior. But, between the three of them, Freeman is the only manager that they single out. It is undisputed that Freeman was one of five decision makers who jointly decided to terminate Lagler. Each of the decision makers had separate experiences with Lagler's behavior to draw from. (Freeman Dep. at 170-78; Vouglas Dep. at 166-67; McCarthy Dep. at 90, 219; Green Dep. at 60-61; Brown Dep. at 199-200.)

Additionally, the assertions in Standing and Roskowiak's affidavits are considerably weakened by vagueness. Roskowiak's affidavit, the more specific of the two, stated that Freeman's body language and tone of voice made it evident that Freeman did not care for Lagler. Roskowiak also states that other nurses would tell her that Lagler had been disciplined for offenses that were not disciplined when carried out by other staff members. The later statement fails to specify the source of the information or the unequal discipline that Lagler allegedly received. Standing's affidavit fails to identify a member of management and the reference to "witch hunters among the staff" is presumably a characterization of fellow nurses—not managerial decision makers. At best, the evidence supports the proposition that Freeman had a dislike for Lagler. This is plainly insufficient to establish pretext. See Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984) ("Title VII is not a shield against harsh treatment at the workplace. Nor does the statute require the employer to have good cause for its decisions. The employer may fire an employee for a good reason, a bad

reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.") (citations and internal quotations omitted).

As a final matter, even if jurors were to believe Roskowiak's statements about Lagler receiving different treatment from Freeman, that fact fails to contradict or discredit Defendants' decision to terminate Lagler on the basis of insubordination. Roskowiak's affidavit states that it had become obvious by mid-2002 that Freeman did not care for Lagler. By mid-2002, a significant amount of evidence had built up concerning Lagler's behavior problems.[13] In light of Lagler's history of poor behavior, the fact that Freeman may have treated Lagler differently in some fashion does not undermine the non-discriminatory reason to terminate Lagler, especially given that four other managers took part in the decision.

Ultimately, then, Lagler rests on his evidence of temporal proximity, discussed in Part II(B)(1) *supra*. While temporal proximity was sufficient to establish a prima facie case, it is insufficient, even when considered in the totality of Lagler's evidence, to establish pretext in this case. The fact that Lagler learned that Defendants' received the EEOC charge on June 26 and that Lagler was terminated on July 3 does not necessarily weaken or contradict Defendants' non-discriminatory reason. See Cooper, 39 F.3d at 740-41 (finding that plaintiff's successful prima facie case on the basis of temporal proximity was insufficient to discredit the defendant's nondiscriminatory reason). Defendants explained that the decision makers were aware of the recent EEOC charge as well as the possibility that the temporal proximity issue might create the

---

[13] By mid-2002, Miller-Rushing had addressed Lagler about two complaints, Vouglas had met with him and received a poor impression, and Freeman had issued the anecdotal note, the counseling memo regarding Jean Jardine, and the annual Performance Review. In the January 16, 2002 anecdotal note, Freeman wrote that Lagler's "attitude and confrontational tone during this meeting were inappropriate and needs to be documented and addressed." (Defs.' Ex. 3.)

19

perception of retaliation. In the end, the managers were unwilling to let that fact deter them from taking what they believed to be the necessary course of action. (Doc. 52 at 20; Vouglas Dep. at 197; Brown Dep. at 198-99.)

The heart of this pretext inquiry is whether the Defendants "honestly believed" that Lagler was insubordinate. Cooper, 39 F.3d at 740. Defendants' evidence demonstrates a well-supported pattern of poor behavior, which was represented by no less than six different managers or supervisors (Botorf, Freeman, Vouglas, McCarthy, Brown, and Green). Lagler's circumstantial evidence fails to present a genuine issue of fact as to the truth of Defendants' proffered reason of insubordination.

## III. CONCLUSION

Defendants' motion for summary judgment (Doc. 48) is accordingly **GRANTED**. All other pending motions are **DENIED** as moot. The Clerk of the Court is directed to **ENTER JUDGMENT** on behalf of Defendants Health First, Inc., and Holmes Regional Medical Center, Inc., and **CLOSE THE CASE**.

**DONE** and **ORDERED** in Orlando, Florida on this _15_ day of June, 2005.

G. KENDALL SHARP
SENIOR UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record

AO 72A
(Rev.8/82)